UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
        v.                          )      CR No. 09-24 S
                                    )
ROCCO DESIMONE                      )
                                    )
_____)

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

I.   Introduction

        Just before Defendant Rocco DeSimone ("Defendant" or "DeSimone") was scheduled to be tried on mail fraud and money laundering charges in January of this year, he decided to plead guilty.   After holding a hearing to assure that DeSimone's choice was voluntary, intelligent, and knowing, the Court accepted his plea.   Now, having lived with the reality of his guilty plea for three months, DeSimone professes buyer's remorse and has moved to withdraw it.

        Because this motion comes prior to sentencing, Defendant must only demonstrate a fair and just reason for taking back the plea.   While concerned that Defendant may have simply crafted an elaborate hoax, the Court concludes that he meets his burden, if only barely, because of the conduct of his attorney at the plea

hearing.   Therefore,  for  the  reasons  fully  explained  below,
Defendant's motion must be GRANTED.

## II.  Factual Background

In 2005, DeSimone was convicted of tax fraud in this Court.
He was sentenced to a twenty-seven month term of imprisonment,
which was to be followed by thirty-six months of supervised
release.   This Court granted bail pending appeal in early 2006;
however, once his conviction was affirmed, he was returned to
federal custody.[1]

Sometime in 2005 and 2006 while he was released on bail,
DeSimone allegedly embarked on several business ventures with an
accountant named Ronald Rodrigues (among others).   On March 11,
2009, a Grand Jury returned an indictment charging DeSimone with
mail fraud and money laundering related to the new business
ventures.   Defendant hired Attorney Richard Corley, and his
associate at the time, Kate Godin, to defend him against the new
criminal charges.

While the case was set for trial last spring, the
government, and thereafter Defendant, filed several successive
motions to continue proceedings.   The parties first cited

---

[1] On March 16, 2008, DeSimone, with the help of his wife,
escaped from federal custody in New Jersey.   He surrendered to
law enforcement officers in Rhode Island a few days later, and
subsequently pled guilty to an escape charge.   As a result,
DeSimone was sentenced to a three-month prison sentence
consecutive to his 2005 sentence, and a concurrent thirty-six
month term of supervised release.

logistical difficulties because of the volume of evidence in the case.  Later, Corley represented that he was not prepared to go to trial due to a death in his family.  Finally, in January 2010, the Court enforced a prior warning that no further delays would be allowed, and informed the parties that empanelment would continue as scheduled on January 5.  It was that morning that Defendant switched course and entered a plea of guilty.

A.   Events prior to the Rule 11 hearing

The following facts are drawn from a hearing held in connection with the present motion.  Defendant, his wife Gail DeSimone (hereinafter "Mrs. DeSimone"), and Corley testified about the events before, during, and after the plea hearing, which form the basis for Defendant's claims here.

DeSimone testified that he had maintained his innocence throughout the case, and only pled guilty at the eleventh hour because he was convinced by his defense attorneys that he would be convicted if the case proceeded to trial.  As a key factor in his decision, Defendant testified, and Corley corroborated, that Corley told DeSimone he would likely be convicted on at least one count in the indictment.  Godin apparently told DeSimone that he would likely be convicted on all counts.

DeSimone testified that Corley brought a copy of a plea agreement to the detention center a few days before the empanelment.  After discussing its contents, DeSimone signed one

copy of the agreement, but oddly also wrote on the copy that he rejected it. Defendant further testified that because he was unable to go through all the discovery documents, and based on conversations with his lawyers, he felt that his defense would fail and he would be convicted. Corley confirmed that he did believe DeSimone would be convicted based upon the evidence that would be presented at trial, although he maintained that the defense was ready to go to trial in spite of the fact that DeSimone had not been able to review the voluminous documents.

DeSimone testified that he maintained his innocence and he asked Corley whether he could plead guilty even though he was not. According to Defendant, Corley assured him that it "happens all the time" and that defendants plead guilty to charges when they are not in fact guilty. (Hr'g Tr. Vol. 1, 190-91, June 21, 2010.)

This suggestion, of course, is anathema to our system of justice. The government vigorously challenged the claim by DeSimone on cross examination. DeSimone's version of what transpired at the hearing, as it was tested on cross examination, is as follows:

Q.   Do you remember swearing to tell the truth?

A.   Yes, I did.

Q.   Are you now saying that you committed perjury that day?

A.    Well, my lawyer is telling me that I have to do
it.  My lawyer is standing on the side of me
says, If you don't do that -- I hadn't pled
guilty yet to the Judge.  And the night before, I
should bring this up, I said to Rick Corley, So
you want me to go into court in front of Judge
Smith and I'm just going to just lie?  And Rick
Corley said to me, That happens all the time that
people plead that aren't guilty.

Q.    So you're now saying something very different.
You're now saying that Mr. Corley advised you to
come into court and lie under oath?

A.    I didn't say he advised me.  I said that I asked
him.  I said, That happens.  He said, That
happens.  He didn't say do it.  He said, That
does happen.

Q.    He told you that it does happen that people
commit perjury and, therefore --

A.    Not commit perjury.  Just come in and they plead
because they can't win.

Q.    And that they admit to the judge the facts of the
case are true even though they're not true and,
therefore, lie under oath, that that happens all
the time?  Is that what Mr. Corley told you?

A.    Mr. Corley said that people who are innocent
plead guilty and are in jail and it happens all
the time.  That's what he said to me that night.

Q.    Then you told him, if I understand you correctly,
that even though you're absolutely innocent, you
intend to come into court the next day, get put
under oath and admit before the Court that you
did something that you actually didn't do?

A.    It was a plea.  I mean, I didn't do -- I did
admit to something I didn't do.

(Hr'g Tr. Vol. 1, 190-91.)

Thus, instead of trying the case, DeSimone decided to sign a new plea agreement, based roughly on the older one; the potential jurors were dismissed and the Court immediately held a plea colloquy with Defendant.  The Court then went over the plea agreement in detail, in accordance with Rule 11.

B.   The Rule 11 hearing

DeSimone claims that during the Government's recitation of facts, DeSimone leaned over and said to Corley that the Government's version was "bullshit" or words to that effect.  According to Defendant, Corley responded that he had to accept the recitation of facts, or the Court would not accept his guilty plea.  Again, this claim was pointedly challenged by the government.

> Q.   And I believe you said that the conversation was
>      a little more detailed, that you first said, This
>      is BS.  I'm not going to go through with it.  And
>      he responded to you, You have to go through with
>      it.  And then you said, It's all the same.  And
>      he said something, Well, if you're found guilty
>      with one charge, you're going to be found the
>      next.  Something along those lines.  Is that what
>      happened the day of the plea?
>
> A.   No, he didn't say that at the plea.
>
> Q.   What happened?  Maybe I misunderstood you.
>
> A.   I said that when I said to Rick, That's BS, I'm
>      not going to say that, he said to me, he said,
>      You have do it, you have to admit to it or Judge
>      Smith will not take the plea.  He says, It
>      doesn't matter.  They're all mail fraud.

Q.   This conversation happened while I was up here
     and I didn't see what was going on?

A.   Yes, that fast.

Q.   I was standing like this facing Judge Smith, and
     you were behind me having this whole conversation
     with Mr. Corley?

A.   It was a five-second conversation.

Q.   But there was back-and-forth in between?

A.   No.  That's the only thing that we said to each
     other when I was standing next to him.

Q.   What was it that I said that was bullshit?

A.   Well, I can't remember everything, but it was
     absolutely more than one.

(Hr'g Tr. Vol. 1, 194-95.)

* * *

Q.   Okay.  The next line, the next paragraph says:
     [An investor] agreed to this arrangement because
     Mr. DeSimone agreed to assume all costs in
     connection with the marketing and development of
     the Drink Stik and because Mr. DeSimone had
     indicated that a person he identified to be Jimmy
     Johnson, the purported CEO of Fidelity
     Investments, was interested in purchasing the
     Drink Stik.  Was that the point in time when you
     told Mr. Corley that what I was saying was BS?

A.   I said this is all BS, yes.

Q.   That's the point in time that you said that?

A.   Yeah.

(Hr'g. Tr. Vol. 2, 50, June 25, 2010.)

Q.   Last time you were lying but today you're not
     lying?

7

    A.    I told you the truth.  Last time Rick told me that that's what I had to say or he wouldn't take the plea.

    Q.    So you're saying last time you lied because Rick told you to lie?

    A.    Well, you're phrasing it the way you want me to say it.  All I can tell you is how it happened. I pled to this case.  We made the deal. Everybody was -- I was happy with what Rick said. I believed him and I pled -- once Rick Corley said to me -- I wasn't going to do it.  He says, If you don't say yes to this, then Judge Smith will not take the plea.

(Hr'g Tr. Vol. 1, 193-P94.)

With several key differences, Corley largely confirmed DeSimone's description of the hearing colloquy.  On direct examination, Corley recounted his version of the back-and-forth with Defendant in the courtroom:

    Q.    All right.  And did Mr. DeSimone say anything to you satto [sic] voce while those facts were being presented to the Court?

    A.    At some point, when [the government] was making some point, he told me -- I'm not sure if he said that wasn't true or that something was bullshit.

    Q.    And he was specifically talking about the factual recitation; is that correct?

    A.    Right.

    Q.    What did you tell him at that time?

    A.    I said if you wish to plead guilty, you must accept the facts that the Government is putting forward before the Court, that you have to agree to plead guilty to those.

8

> Q.   Even though he just said those aren't true or, to use his words, that's bullshit, correct?
>
> A.   That's correct.
>
> Q.   And he then -- you told him that he had to accept those facts, correct?
>
> A.   I told him in order for the Judge to accept his plea, that he would have to plead guilty to the facts as stated by the U.S. attorney.
>
> Q.   And if he didn't, what did you tell him his alternative was?
>
> A.   Go to trial.
>
> Q.   All right.  And you had already told him that you didn't think you were going to prevail in that trial, correct?
>
> A.   I told him that I thought the odds were against us.

(Hr'g Tr. Vol. 1, 70-71.)

Upon cross-examination, Corley attempted to further explain the substance of his advice to DeSimone regarding his guilty plea before the Court, emphasizing that he never advised him to lie to the Court:

> Q.   And you didn't encourage Mr. DeSimone to lie under oath, did you?
>
> A.   No.
>
> Q.   You would never do that, would you?
>
> A.   No.  I would never tell someone that I was representing that they should lie under oath.
>
> Q.   So when Mr. DeSimone said that he heard the facts that [the government] had recited and that he

agreed with them, at that point in time, did you believe that he was lying?

A.   I think that his exact answer was, "I heard every single word," if I remember, because I thought it was something that I hadn't heard a defendant say before.  Usually they say yes.

Q.   And then you subsequently heard him say that in fact it was true or that he was guilty?

A.   I believe that's in the -- I haven't memorized the plea transcript.  If it says it, I believe it.[2]

Q.   Let me ask it a different way.  Did you believe that Mr. DeSimone was lying to the Court when he entered his plea of guilty?

*  *  *

A.   I think that he was accepting the responsibility for the acts for which the Government had brought

---

[2]  In actuality what transpired between DeSimone and the Court immediately after the government concluded its recitation of facts was much more explicit than Corley suggests:

Q.   All right.  Mr. DeSimone, did you listen very carefully to what [the government] described as the facts that the Government would prove if this case were to go to trial?

A.   Every bit of it, your Honor.

Q.   And do you agree that those are the facts of this case?

A.   Right.

Q.   Is there anything in what [the government] described, anything in what he said that you believe is not true or is incorrect for any reason?

A.   No.

Q.   Are you sure?

A.   (Witness nods head in the affirmative.)

Q:   Okay. I'm now going to ask you then how you wish to plead to the charges against you, guilty or not guilty?

A:   Guilty.

(Change of Plea Transcript, 21-22, Jan. 5, 2010.)

against him.   I don't know that I would characterize it as a lie or the truth.   I wasn't there.   The only thing that I could do was tell my client that in order to plead guilty to the indictment that he had to accept the colloquy that was presented by the Government, that I did not believe that this was the type of case in which an Alford plea would be admissible so that I heard him admit the facts.

Q.   Correct me if I'm wrong, Mr. Corley, you're not suggesting that you advised your client to lie and to falsely admit to things that he didn't do?

A.   You're absolutely correct.   I did not advise him to lie.

Q.   You're simply telling him that if he wants to plead to guilty, he needs to admit he committed the crime?

A.   Absolutely.

Q.   And if he doesn't want to admit that he committed the crime, then he has the option, which every American citizen has, of going to trial?

A.   I told him that also.

Q.   And you were prepared to go to trial that day?

A.   Yes.

(Hr'g Tr. Vol. 1, 112-14.)   Thus, while it is apparent that Corley did not explicitly advise his client to lie to the Court, there is also no evidence that he advised him of his obligation to tell the unvarnished truth, even though Defendant was under oath.   Perhaps more important is what DeSimone took from Attorney Corley's words.   It appears that while Corley attempted to convey his advice in a nuanced way, DeSimone heard a blunter

11

message: call it whatever you will, but accepting a factual recitation that is not all true is simply business as usual in the courts and you must do it if you want your plea accepted.

C.   Events after the Rule 11 hearing

Mrs. DeSimone, the third witness at the hearing, testified that only after Defendant pled guilty did she discover "new" evidence that she believed would prove her husband's innocence. Mrs. DeSimone recounted that the government had returned several tape recordings that were confiscated when the DeSimones' house was searched; these tape recordings were made when Mrs. DeSimone secretly recorded conversations that she had with several individuals connected with the case. One of the conversations she recorded was with Rodrigues, a prime witness in the government's case, who had also testified before the grand jury.

Mrs. DeSimone testified that upon listening to this conversation, she became convinced that it was exculpatory and immediately turned it over to Corley. Although it is unclear exactly when this occurred, after Defendant and Corley heard the tape, they also felt it was significant and Defendant testified that he asked Corley to immediately move to withdraw his guilty plea based on this "new" evidence. In addition, at some point after Defendant pled guilty, Corley listened to another of Mrs. DeSimone's recordings, already in his possession, and decided that it, too, was exculpatory. This second tape contained a

12

recording of a conversation between Mrs. DeSimone and Parish Lentz, a patent lawyer who allegedly did work for Rodrigues.[3]

III. Discussion

    A.   The context of the present motion

It is beyond question that the guilty plea and the Rule 11 hearing form one of the linchpins of the federal criminal justice system. According to the most current data available, defendants pled guilty in more than 90% of criminal cases brought in this Circuit.[4] This underscores the importance of assuring that defendants who forego trials receive due process.

The chief protection for defendants who plead guilty is the Rule 11 plea colloquy. It is here that the trial judge must ensure that a defendant makes his choice intelligently,

---

[3] In spite of Defendant's request, the motion to withdraw his plea based on the tapes was not filed until March 29, 2010. By that time, DeSimone had engaged new defense counsel, Paul DiMaio, Esq. and Thomas Connors, Esq., who filed supplemental briefs in support of withdrawing the guilty plea. Corley and Godin withdrew as counsel.

[4] During the year ending September 30, 2008, the government brought 2,212 criminal cases in the First Circuit. (See Table D-7, U.S. District Courts – Criminal Defendants Disposed of, by Type of Disposition and District (Excluding Transfers), During the 12-month Period Ending September 30, 2008, available at: http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2008/appendices/D07Sep08.pdf (last visited Sept. 9, 2010).) Of these, three hundred cases were dismissed. Thus, in this Circuit alone, defendants faced the decision to enter a plea or to proceed to trial in 1,912 cases. Id. Of those 1,912 cases, only 115 went to trial. Of those, 92 resulted in convictions and 23 in acquittals. Id. The remaining 1,797 cases (or 94%) resulted in guilty pleas.

knowingly, and without force or coercion. Judges rely upon counsel for the government and the defendant to adequately prepare each defendant for this hearing, to ensure that the defendant knows exactly what it is that he is agreeing to and that once he enters his plea, he cannot go back.

Perhaps too often, the Rule 11 hearing becomes a mechanical exercise: the court asks the usual questions and defendants answer yes or no. More often than not Defendants do not voice any disagreement with the government's factual proffer. And, although small facts are disputed in a healthy number of cases, they usually have no bearing on the validity of the plea, because they do not go do the elements of the crime the government must prove. Experienced counsel know how to navigate these issues, even with difficult clients.

The scenario presented by Defendant's motion reveals the importance of the dialogue between the judge and the defendant, and the critical role defense counsel plays in guiding the defendant through the plea colloquy with the Court. When these roles are not performed correctly, the process can break down. And that is what happened in this case.

B.   The Legal Standard

At bottom, "the formalities imposed by Rule 11 . . . are intended to assure that the defendant understands the charge and the consequences of the plea." <u>United States v. Padilla-</u>

_Galarza_, 351 F.3d 594, 597 (1st Cir. 2003). "'We have identified three 'core concerns' of Rule 11: 1) absence of coercion; 2) the defendant's understanding of the charges; and 3) the defendant's knowledge of the consequences of the guilty plea' [and] [f]ailure to address one of these concerns requires that the guilty plea be set aside." _United States v. Isom_, 85 F.3d 831, 835 (1st Cir. 1996) (quoting _United States v. Gray_, 63 F.3d 57, 60 (1st Cir. 1995) and citing _United States v. Cotal-Crespo_, 47 F.3d 1, 4 (1st Cir. 1995)). In the absence of failure to address a core concern, "the question to be determined is whether deficiencies in the Rule 11 hearing affected the defendant's 'substantial rights.'" _Gray_, 63 F.3d at 60.

Rule 11(d) guides the Court with respect to the withdrawal of a guilty plea prior to sentencing. Fed. R. Cr. P 11(d)(2)(B). In order to undo a guilty plea, a defendant has the burden to demonstrate a "fair and just reason" for withdrawal. _United States v. Marrero-Rivera_, 124 F.3d 342, 347 (1st Cir. 1997). This determination remains committed to the discretion of the court, but "[t]here is no absolute right to withdraw a guilty plea prior to sentencing." _Id._ The First Circuit, no doubt recognizing the practical considerations discussed above and the pressures on the system, has noted that

15

> [a]lthough older case law endorses a liberal approach to pre-sentence plea withdrawals, United States v. Ramos, 810 F.2d 308, 311 (1st Cir. 1987), it is questionable how far this view has survived the pressure of growing dockets and an increasing appreciation of the grim dynamics of plea bargaining, including the prevalence of "buyer's remorse" among those who have pled.

United States v. Torres-Rosario, 447 F.3d 61, 66 (1st Cir. 2006) (citing United States v. Mescual-Cruz, 387 F.3d 1, 6 (1st Cir. 2004), cert. denied, 543 U.S. 1175 (2005)).

The First Circuit has stated that the most significant factor for a court to consider in deciding a motion to withdraw a plea is whether the plea was voluntary, intelligent and knowing, within the meaning of Rule 11.  Other factors to consider include:  "(1) the force and plausibility of the proffered reason; (2) the timing of the request; (3) whether the defendant has asserted his legal innocence; and (4) whether the parties had reached a plea agreement."  Isom, 85 F.3d at 834 (quoting United States v. Cotal-Crespo, 47 F.3d 1, 3-4 (1st Cir. 1995)).  "[P]lausibility cannot just rest on [a defendant's] second thoughts 'about some fact or a point of law, or about the wisdom of his earlier decision.'"  United States v. Muriel, 111 F.3d 975, 978 (1st Cir. 1997) (quoting Isom, 85 F.3d at 837).  Finally, if the defendant meets his burden, the Court must then evaluate the "plea withdrawal in relation to any demonstrable prejudice that will accrue to the government if the defendant is permitted to alter his stance."  Isom, 85 F.3d at 835.

16

DeSimone asserts numerous reasons to justify withdrawal; however, only three deserve attention here.[5] DeSimone argues that his plea should be withdrawn because, (1) defense counsel was ineffective; (2) the Court failed to properly advise Defendant of the sentencing consequences of 28 U.S.C. § 3247 at the Rule 11 hearing; and (3) the tape recordings constitute newly-discovered evidence. The government counters that Defendant's motion is untimely; the plea agreement here was reached after serious discussion and negotiation between Defendant and the government; and the government will be prejudiced if withdrawal is allowed.

C.   Ineffective Assistance of Counsel

1.   Defendant's disagreement with the facts supporting conviction

The First Circuit has stated that "[w]hether a defendant has pled intelligently and voluntarily, depends upon the competence of counsel's advice" and "ineffective assistance of counsel, is . . . a 'fair and just reason'" supporting withdrawal. United States v. Ramos, 810 F.2d 308, 313 (1st Cir. 1987). Indeed, a "critical obligation of counsel [is] to advise the client of 'the advantages and disadvantages of a plea agreement.'" Padilla v. Kentucky, 130 S. Ct. 1473, 1484 (2010)

---

[5] Defendant's arguments concerning restitution, consecutive sentencing, and Corley's intention to make a "double-counting" argument are meritless and do not warrant discussion.

(quoting Libretti v. United States, 516 U.S. 29, 50-51 (1995)).

In order to meet his burden Defendant must show, according to the strictures of Strickland v. Washington, 466 U.S. 668 (1984), that first, "counsel's performance in advising guilty pleas fell below the standard of performance of reasonable proficient counsel," and second, that "by such inadequate performance, Appellant was induced to enter guilty pleas which he otherwise would not have entered." Isom, 85 F.3d at 837 (quoting United States v. Austin, 948 F.2d 783, 786 (1st Cir. 1991) and citing Ramos, 810 F.2d at 314).

The evidence regarding Corley's conversation with Defendant in the courtroom during the government's recitation of the facts gives the Court serious concern about the quality of Defendant's plea.  Both Corley and Defendant testified that Defendant told Corley that he disagreed with the government's proffer of the facts concerning his alleged offenses.  Neither Corley nor Defendant advised the Court of this.  Defendant testified that Corley advised him that "he had to accept all the facts as stated" if he wanted the judge to accept his plea.  Defendant also testified that while he was consistently professing his innocence, he was advised a few days earlier that innocent defendants plead guilty "all the time."

It does not appear that Corley explicitly told Defendant to lie to the Court. The problem is that the context of the

18

conversations supports DeSimone's claim that he believed lying to the Court was permissible, and even necessary, to get his guilty plea accepted.

Defendant's concerns about the government's factual proffer required more candor on the part of Corley to the Court. The fact that Corley did not bring DeSimone's disagreement with the proffer to the Court's attention, and the way in which he left Defendant with the impression that lying to the Court was necessary to get his plea accepted, undermines the finding of the Court that the plea was "knowing, voluntary, and intelligent." For this reason, Defendant must be allowed to withdraw his plea.

It is possible that the facts Defendant disagreed with were not essential to proving the charges against him, and therefore the mistake by counsel could be found to be harmless. On the record before the Court, however, there is no way to tell whether those facts were relevant to the elements of the charges or completely tangential. The proper time for that discussion, however, was at the plea hearing, before the plea was taken. Instead, as it went down in this case, the plea colloquy was reduced to a hollow farce, and it cannot be allowed to stand.

For these reasons, the Court concludes that Defendant has offered a fair and just reason for withdrawing his guilty plea. Therefore, the Court need not address Defendant's remaining

19

arguments in detail.  However, several points merit some brief discussion.

> 2.   Losses and number of victims

DeSimone also argues that Corley acted improperly because he had DeSimone stipulate to an amount of money and number of victims that he disagreed with.  The Plea Agreement provides under ¶ 2, "Government's Obligations.  In exchange for Defendant's plea of guilty:"

> d.   The parties agree that the actual loss as a result of the offense is more than $1,000,000 but less than $2,500,000 and therefore that the base offense level is increased by 16 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(I).

> e.   The parties agree that the offenses involved 10 or more victims and therefore that a 2-level increase in the offense level applies under U.S.S.G. § 2B1.1(b)(2)(A).

(Plea Agreement ¶ 2, Jan. 5, 2010, EFC No. 41.)

Notably, however, ¶ 4 of the agreement also preserved the parties' rights to debate further departures from the recommended sentencing in the agreement.

> 4.   Except as expressly provided in paragraph 2, there is no agreement as to which Offense Level and Criminal History Category applies in this case.  Both the United States and Defendant reserve their rights to argue and present evidence on all matters affecting the guidelines calculation.

(Plea Agreement ¶ 4 (emphasis added).)  Thus, while the parties agreed on default guidelines adjustments in ¶ 2, unlike in some cases, neither side was prohibited from making further arguments

about the guideline range.   Cf. United States v. Centeno, 342 Fed. Appx. 644, 646 (1st Cir. 2009) (the plea agreement provided that "no further adjustments or departures to the defendant's base offense level . . . or a variance from the recommended sentence of imprisonment" could be sought).

As a result, Corley correctly advised Defendant that he could argue to reduce the tally of victims and dollar amounts at sentencing, provided he presented evidence to counter the figures in the pre-sentence report. See United States v. Cyr, 337 F.3d 96, 100 (1st Cir. 2003) ("if the defendant's objections to the PSR are merely rhetorical and unsupported by countervailing proof, the district court is entitled to rely on the facts in the PSR").   True, the stipulations in the plea agreement are "damning evidence" to be considered by the Court. Cyr, 337 F.3d at 100.   But Corley did not err in his advice, because the plea agreement permits DeSimone the opportunity to argue for reductions in his offense level.

D.   Sentencing Consequences of 18 U.S.C. § 3147

Defendant next argues the Court failed to account for 18 U.S.C. § 3147 during the plea hearing.   The statute provides, in relevant part:

> A person convicted of an offense committed while released under this chapter shall be sentenced, in addition to the sentence prescribed for the offense to--

> (1) a term of imprisonment of not more than ten
> years if the offense is a felony
>
> . . . .
>
> A term of imprisonment imposed under this section
> shall be consecutive to any other sentence of
> imprisonment.

18 U.S.C. § 3147. Section 3C1.3 of the sentencing guidelines

advises, "[i]f a statutory sentencing enhancement under 18

U.S.C. § 3147 applies, increase the offense level by 3 levels."

U.S.S.G. § 3C1.3 (2010).

As is the common practice, the indictment did not charge

Defendant with violating § 3147 as a separate count. But the

statute, DeSimone objects, nevertheless authorizes a

"consecutive" sentence enhancement of up to ten years. Thus, he

says, while the Court informed Defendant at the plea hearing

that he faced up to 190 years of incarceration based on the

offenses charged, it should have recognized that § 3147 lifted

the maximum to 200 years.

First Circuit authority guts Defendant's interpretation.

His view would mean, of course, that § 3147 violates Apprendi v.

New Jersey, 530 U.S. 466, 474 (2000), because the law would

permit an increase in the statutory maximum based on facts not

found beyond a reasonable doubt by a jury. But in United States

v. Randall, 287 F.3d 27 (1st Cir. 2002), the First Circuit

rejected an Apprendi challenge to § 3147 as "moot" under the

guidelines.  The Court explained that a § 3147 enhancement under the predecessor to § 3C1.3 was "only for purposes of calibrating where, within the underlying conviction count guideline range, a sentence below the applicable conviction count maximum may be imposed."  Randall, 287 F.3d at 30 (emphasis added).  In other words, § 3C1.3 allows bumping up a defendant's offense level, but only if there is room to do so below the maximum guidelines punishment for the crimes charged.  Because the guidelines never exceed the statutory ceiling, in no event could § 3147 "trip a new statutory maximum."  Id. at 31 (citation omitted).

Defendant argues that this formula was mandatory at the time of Randall; however, post-Booker the Court could theoretically disregard the guideline and sentence above the guideline range, and thus potentially above the statutory maximum for the indicted crimes.  See United States v. Booker, 543 U.S. 220 (2005).  This argument is unpersuasive, because controlling law in this Circuit supports the method described in the sentencing guidelines, regardless of whether the guidelines themselves are advisory.  See Randall, 287 F.3d at 30-31.  The Court therefore remains unconvinced that it committed any error in advising Defendant of his maximum penalty.

In any event, in this case, the plea agreement specifically discusses the sentencing enhancement under § 3C1.3.  Defendant testified that Corley discussed making an argument, carefully

preserved by the agreement, that the guideline "double-counted" his criminal history.  Thus, Defendant was well-aware of the additional sentencing implications he faced because the acts were committed while he was on release.[6]

For these reasons, it is not plausible that the alleged misstatement of the statutory maximum could have tainted Defendant's plea.

E. Newly discovered tape recordings

Defendant next argues that the two tape recordings discussed at the hearing constitute newly discovered evidence justifying the withdrawal of his guilty plea.  See United States v. Showalter, 569 F.3d 1150, 1154-55 (9th Cir. 2009).  One of the recorded conversations, between Lentz and Mrs. DeSimone, was in the possession of Corley the entire time, even though he only listened to it after DeSimone pled guilty.  That recording plainly does not present a reason to allow withdrawal, because it is not "newly discovered evidence."

The same may be said regarding the second tape, of a conversation between Mrs. DeSimone and Rodrigues, which she "discovered" after obtaining her tapes back from the government.

---

[6] Even if Defendant truly faced a 200 year statutory maximum sentence, as opposed to the stated 190 years, Defendant testified that he did not know if this would have been material to him when he decided to plead.  Moreover, he testified that his assumption was that he would actually receive seven to nine years.

24

Mrs. DeSimone made the recording herself, so must have known of it at some point, although she claimed that her memory was affected by cancer treatments she was receiving. Regardless, even assuming Mrs. DeSimone's memory lapses excused its nondiscovery, it still would not justify withdrawal. "[W]hen the defendant's factual allegations, even if true, fail to establish a cognizable defense, they do not provide a reason for permitting withdrawal of a plea." United States v. Allard, 926 F.2d 1237, 1242 (1st Cir. 1991) (citing United States v. Barker, 514 F.2d 208, 220 (D.C. Cir. 1975)). Defendant contends that the tape demonstrates he had no intent to defraud anyone, and was instead advised by others to take the actions he did. This argument may be plausible, but Defendant simply has not made a sufficient showing at this point to convince the Court that the interests of justice compel withdrawal on that basis. In due time the case will be tried to a jury. If this tape becomes evidence at trial it will be for the jury to assess whether it supports Defendant's contention.

F. Remaining Factors: Timeliness and Prejudice

The remaining factors to be addressed, in particular the timing of the request, and whether there is prejudice to the government, do not alter the Court's conclusion. It is true that "[d]elayed requests [for withdrawal of a guilty plea], even if made before sentencing, are generally regarded with

disfavor." <u>United States v. Parrilla-Tirado</u>, 22 F.3d 368, 373 (1st Cir. 1994).    The parties quibble over whether the gap should be measured from the date of the plea or the discovery of "new" evidence, but in the end this does not matter.    Given the basis of the Court's holding, the delay is excusable.

Where a defendant has offered a fair and just reason for withdrawal, the Court must also consider the prejudice to the government in granting the motion.    Here, there has been some delay, and the government will undoubtedly face difficulty trying to assemble the witnesses once more; there is no claim that witnesses are now unavailable, or that evidence has been destroyed or the like.    The prejudice amounts to inconvenience to the government and its witnesses.    While that is unfortunate, it is not enough to persuade the Court that Defendant's motion should be denied.    Therefore, after careful consideration, the Court concludes that the prejudice to the government is not so great as to bar withdrawal of DeSimone's guilty plea.

III. Conclusion

For the reasons set forth above, the Court GRANTS Defendant Rocco DeSimone's motion to withdraw his guilty plea.   This matter shall once again be set down for trial.

IT IS SO ORDERED:

*/s/ William E. Smith*

William E. Smith
United States District Judge
Date:   September 10, 2010